*11-4021-cv (L)*
*In re World Trade Center Disaster*
*(Cirino et al. v. City of New York et al.)*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term 2012

(Argued: April 11, 2013        Decided: June 9, 2014)

Docket Nos. 11-4021-cv (L), 10-1377 (Con.), 10-1378 (Con.), 10-1379 (Con.), 10-2765 (Con.), 10-2794 (Con.), 10-2795 (Con.), 10-3172 (XAP), 10-3175 (XAP), 10-3176 (XAP), 11-0355 (Con.), 11-0392 (Con.), 11-0411 (Con.), 11-3902 (Con.), 11-3903 (Con.), 11-3925 (Con.), 11-3933 (Con.), 11-3937 (Con.), 11-4313 (XAP), 11-4317 (Con.), 11-4365 (XAP), 11-4379 (XAP), 11-4410 (XAP), 11-4502 (XAP), 11-4800 (XAP), 11-4888 (XAP), 12-2960 (Con.), 12-2963 (Con.), 12-2964 (XAP), 12-2974 (Con.), 12-2977 (XAP), 12-2998 (Con.), 12-3025 (XAP), 12-3042 (Con.), 12-3185 (Con.), 12-3186 (XAP), 12-3254 (Con.), 12-3282 (Con.)

---

IN RE: WORLD TRADE CENTER DISASTER SITE LITIGATION

---

CHRISTOPHER CIRINO, *et al.*,

*Plaintiffs-Appellees-Cross-Appellants,*

*v.*

CITY OF NEW YORK, *et al.*

*Defendants-Appellants-Cross-Appellees,*

SULLIVAN PAPAIN BLOCK MCGRATH & CANNAVO P.C.,
*Interested Party-Cross-Appellant.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

Before:

HALL and CHIN, *Circuit Judges*,
and RESTANI, *Judge*.[*]

Consolidated appeals from three orders of the United States District Court for the Southern District of New York (Alvin K. Hellerstein, *J.*) issued with respect to the settlement of personal injury claims brought by individuals participating in rescue, recovery, and clean-up operations at the World Trade Center site following the attacks on the World Trade Center on September 11, 2001.

REVERSED IN PART, AFFIRMED IN PART,
AND VACATED AND REMANDED IN PART.

———————————————

DENISE A. RUBIN (Paul J. Napoli, *on the brief*), Worby Groner Edelman & Napoli Bern, LLP, New York, N.Y., *for Plaintiffs-Appellees-Cross-Appellants*.

BRIAN J. SHOOT (Andrew J. Carboy, Nicholas Papain, Wendell Y. Tong, *on the brief*), Sullivan Papain Block McGrath & Cannavo P.C., New York, N.Y., *for Sullivan Plaintiffs-Appellees and Interested Party-Cross-Appellant*.

———————————————

[*] The Honorable Jane A. Restani, of the United States Court of International Trade, sitting by designation.

-2-

MARGARET H. WARNER ( M. Miller Baker, Mark A. Collins, Joshua D. Rogaczewski, *on the brief*), McDermott Will & Emery, New York, N.Y., *for Appellant WTC Captive Insurance Company, Inc.*

James E. Tyrell, Jr., Joseph E. Hopkins, Jason W. Rockwell, Alyson N. Villano, Patton Boggs, LLP, Newark, N.J., *for Defendant-Appellants-Cross Appellees City of New York and Contractors.*

EVAN R. CHESLER (Antony L. Ryan, on the brief), Cravath, Swaine & Moore LLP, New York, N.Y., *Amicus Curiae Appointed Counsel.*

CHIN, *Circuit Judge:*

In the aftermath of the attacks on the World Trade Center on September 11, 2001, thousands of individuals -- firefighters, police officers, construction and cleaning workers, and others -- participated in rescue, recovery, and clean-up operations at the World Trade Center site and surrounding areas. Many sustained injuries, and eventually more than 10,000 lawsuits were filed against the City of New York, private contractors, and the WTC Captive Insurance Company, Inc. (the "WTC Captive"). The cases were consolidated before a single judge, the Honorable Alvin K. Hellerstein, in the United States District Court for the Southern District of New York.

After years of litigation and extensive negotiations, the parties agreed on a comprehensive settlement process, which was set forth in a detailed master settlement agreement executed in June 2010. The settlement process gave each plaintiff the opportunity to participate in the settlement, and the parties agreed that the settlement would become effective only if at least 95% of the plaintiffs "eligible" to participate agreed to do so. Questions were raised -- some by the district court *sua sponte* -- with respect to the implementation of the settlement process. The district court issued three orders addressing these questions; they are the subject of these consolidated appeals.

For the reasons set forth below, we affirm in part, reverse in part, and vacate and remand in part.

## BACKGROUND

The district court issued the three orders in question during its supervision of the settlement process in this complex litigation. The district court employed a number of case-management techniques to improve efficiency and to encourage settlement, including consolidating the cases for pretrial purposes, organizing the cases into three master dockets, appointing "Plaintiffs' Liaison Counsel," appointing special masters, and permitting counsel to use a "Master Complaint" and a "Core Discovery" program. The district court also called for

-4-

the parties, with assistance from the special masters, to identify the cases alleging the most serious injuries for early trial; the first of these trials was scheduled to commence in May 2010.

In March 2010, two months before the first trials were to begin, the City and plaintiffs' counsel advised the district court that they had reached a settlement. The City's insurer -- the WTC Captive Insurance Company ("WTC Captive")[1] -- participated in the settlement negotiations. The agreement provided for the WTC Captive to pay at least $575 million to settle claims against the City, provided that at least 95% of the plaintiffs eligible to participate accepted the settlement. The agreement provided that the WTC Captive would pay additional amounts if (1) more than 95% of eligible plaintiffs participated and (2) relatively few new lawsuits were filed. The proposed settlement also provided for plaintiffs' counsel to receive a one-third contingency fee. The parties also agreed to a process whereby an independent arbiter, the "Allocation Neutral," would divide the eligible plaintiffs into four tiers for purposes of awarding payments according to the severity of the injury.

---

[1] The WTC Captive was created in 2003 and funded with $1 billion through the Federal Emergency Management Agency to insure the City against "claims arising from debris removal, which may include claims by city employees." Consolidated Appropriations Resolution 2003, Pub. L. No. 108-7, 117 Stat. 11, 517-18 (2003).

Although the parties did not seek its approval, the district court found the settlement to be inadequate. The district court concluded, *inter alia*, that the proposed settlement provided insufficient consideration for the settlement of nearly all the claims while providing overly generous compensation for plaintiffs' counsel. The district court was also concerned about the lack of any meaningful review of decisions of the Allocation Neutral.

The parties renegotiated and returned in June 2010 with an amended Settlement Process Agreement (the "Agreement"), which responded to a number of the district court's concerns. Among other changes, the principal settlement amount was increased from a range of $575 to $632.5 million to a range of $625 to $712.5 million. Plaintiffs' counsel agreed to reduce their contingency fees from one-third to one-quarter. The parties also created the position of "Appeal Neutral" to review determinations of the Allocation Neutral.

Over the parties' objection, the district court conducted a hearing to determine whether the amended settlement process, as set forth in the Agreement, was fair and reasonable. The district court also appointed an ethics expert to review plaintiffs' counsel's communications with their clients about the settlement. The district court noted the possibility of conflicts of interest stemming from the fact that as participation in the settlement increased, so

would plaintiffs' counsel's fee.  After extensive inquiry into the Agreement, the district court found it to be fair and reasonable.

As implementation of the Agreement proceeded, a number of issues arose.  Three aspects of the Agreement are now before us:  (1) the "Bonus Payment," (2) the "Contingent Payments," and (3) attorneys' fees.

## A.    *Bonus Payment*

The Agreement provided that it did not become effective unless 95% of eligible plaintiffs opted in to the settlement.  If more than 95% opted in, however, the WTC Captive would pay a "Bonus Payment," the amount of which would increase as the percentage of opt-ins increased.[2]  The Agreement calculated the opt-in percentage as the number of eligible plaintiffs who affirmatively opted in to the settlement over the total number of plaintiffs eligible for recovery.  Plaintiffs were required to track the eligible plaintiffs through the Eligible Plaintiffs List ("EPL").  Eligibility was defined as follows:

> Only Plaintiffs with Debris Removal Claims filed . . . on or before April 12, 2010 . . . shall be eligible for inclusion on the Eligible Plaintiff List; provided, however, that such Plaintiffs who dismiss with prejudice . . . by executing the Stipulation of Dismissal With

---

[2]    The Agreement provided that the WTC Captive would pay 2% of the "Settlement Amount" for every 1% in excess of the 95% requirement, except that if the actual opt-in percentage exceeded 98%, the WTC Captive was obligated to pay 0.20% of the Settlement Amount for every 0.10% above the 95% threshold.

Prejudice attached as Exhibit S to this Agreement need not be included on the [EPL] . . . .

The Agreement further provided:

Plaintiffs who dismiss all of their Debris Removal Claims against the Insureds with prejudice by filing the Stipulation of Dismissal with Prejudice attached as Exhibit S . . . shall not be counted for purposes of determining compliance with the Opt-In Threshold. . . .

The parties were eager to reach 95% participation, and they twice requested an extension of the opt-in deadline. The district court granted the requests. Shortly before the second extended deadline, the parties submitted stipulations of dismissal as to 185 plaintiffs. Troubled by the fact that so many stipulations surfaced on the eve of the opt-in deadline, the district court *sua sponte* ordered a hearing to determine whether the dismissals were authorized by the clients. At the hearing, the district court learned that plaintiffs' counsel were inferring authorization to dismiss from their clients' failure to respond to their communications. In other words, the clients did not explicitly authorize counsel to dismiss their claims, but had simply not responded to counsel's inquiries.

The district court refused to accept these dismissals, and *sua sponte* appointed Special Counsel to try to speak to every plaintiff who rejected the Agreement or had failed to communicate a decision. After two months, Special Counsel had made attempts to talk to 546 plaintiffs, but could not reach 409 of

them.  In an order dated December 30, 2010, the district court dismissed the claims of the 409 plaintiffs for failure to prosecute, giving them 30 days in which to seek relief.  The district court further ordered these plaintiffs excluded from the EPL, relying on the Agreement's requirement that "Plaintiffs who dismiss with prejudice . . . need not be included on the Eligible Plaintiff List."  Thereafter, 25 of the 409 plaintiffs were heard from and were reinstated.

With the net of nearly 400 plaintiffs eliminated from the EPL, the opt-in rate of eligible plaintiffs rose to 99%; as consequence, the district court ordered defendants to make a Bonus Payment of $55 million.  Defendants objected, arguing that only plaintiffs whose claims were *voluntarily* dismissed should be excluded from the EPL, and that the plaintiffs whose claims were involuntarily dismissed should be included.  The district court rejected this argument.  The Agreement became effective on January 5, 2011, and on January 25, 2011, the claims of the settling plaintiffs were dismissed.  The City contends that the correct opt-in percentage is 96% and that the correct Bonus Payment amount is $12.5 million and not the $55 million ordered by the District Court.

**B.** *Contingent Payments*

The Agreement also set forth certain circumstances under which defendants would be required to make "Contingent Payments."  These are

payments that must be made on the first five anniversaries of the effective date of the Agreement if fewer than certain designated numbers of "New Debris Removal Claims" are "filed or submitted" "as of" the relevant Contingent Payment Determination Date. Specifically, it provided that if fewer than 220 such claims" were "filed or submitted" by the "First Contingent Payment Determination Date [January 5, 2012]," the City would be obligated to make a Contingent Payment. The Agreement defined "New Debris Removal Claims" as:

> all Debris Removal Claims filed, or asserted for the first time against the Insureds or any of them in a complaint, an amended complaint, a summons with notice, or a notice of claim served on or after April 13, 2010 . . . .

In January 2012, the parties advised the district court that 260 new claims had been "filed or submitted" since the effective date of the Agreement. Most of the claims, however, had been dismissed before the determination date, leaving only 84 new claims pending.[3] Accordingly, defendants took the position that defendants were not obligated to make the First Contingent Payment.

---

[3] A New York law extended the statute of limitations to September 16, 2010, and nearly 300 new claims were filed just before the extended deadline. Then, in January 2011, Congress passed the James Zadroga 9/11 Health & Compensation Act ("Zadroga Act"), which reopened the federal Victim Compensation Fund. It provided that claimants could not be compensated by the Victim Compensation Fund if they were parties to court litigation. Claimants who wished to partake of the Victim Compensation Fund were therefore required to withdraw from any lawsuit by January

-10-

Plaintiffs did not object. The district court, however, issued an order *sua sponte* requiring defendants to document the New Debris Removal Claims that had been filed and withdrawn between April 13, 2010 and January 5, 2012, and the litigation costs associated with those claims. Plaintiffs' counsel then reversed position, arguing that the First Contingent Payment was due.

In an opinion and order entered July 13, 2012, the district court ordered defendants to make the First Contingent Payment of $5 million. The district court reasoned that "the critical date for counting newly filed or submitted claims was January 5, 2012," and that "a claim that was withdrawn or dismissed on the merits prior to the critical date . . . is not a claim to be counted."

C.  *Attorneys' Fees*

The third issue presented by these appeals is whether plaintiffs' counsel are entitled to a percentage of the Bonus Payment and Contingent Payments as attorneys' fees. On this issue, the Agreement provides:

> The Settlement Amount, the Contingent Payment(s), if any, and any payment due pursuant to Section VI.E of this Agreement [the Bonus Payment] shall include all of Plaintiffs' Liaison Counsel's fees, costs and expenses and the fees, costs and expenses of all other counsel engaged by any Plaintiff or Plaintiffs. . . .
> . . .

---

2, 2012. As a result, nearly all the claims that were filed around September 16, 2010 were withdrawn or dismissed by January 2, 2012.

. . . Plaintiffs' attorneys voluntarily agree to reduce their fees to twenty-five percent (25%) of all payments to Plaintiffs or claimants whose Debris Removal Claims against the Insureds or any of them are settled by this Agreement net of Plaintiffs' counsel's reimbursable expenses, including without limitation any and all Contingent Payments . . . and any and all payments which become due pursuant to Section VI.E of the Agreement [the Bonus Payment].

On September 8, 2011, the district court ruled *sua sponte* that plaintiffs' counsel were not entitled to any portion of the Bonus Payment. The district court reasoned that the 25% fee from the base settlement amount was sufficient to compensate plaintiffs' counsel. On July 13, 2012, citing similar concerns, the district court held *sua sponte* that plaintiffs' counsel were not entitled to any portion of the Contingent Payments. The district court suggested that allowing plaintiffs' counsel to receive a portion of the Contingent Payments was unethical because it incentivized them to avoid taking on new clients.

Defendants appeal the district court's orders of December 30, 2012 and September 8, 2011, as they relate to the Bonus and Contingent Payments. Plaintiffs' counsel appeal the portions of the September 8, 2011 and July 13, 2012 orders denying recovery of attorneys' fees from the Bonus and Contingent Payments.[4]

---

[4]     This Court appointed Evan Chesler as amicus curiae "to argue in support of the district court's decisions with respect to attorneys' fees related to the 'bonus payments' and 'contingent payments.'" (Order dated March 13, 2013).

## *DISCUSSION*

A settlement agreement is a contract that must be construed in accordance with general principles of contract law. *Collins v. Harrison-Bode*, 303 F.3d 429, 433 (2d Cir. 2002). Hence, on appeal, we review the district court's legal conclusions interpreting a settlement agreement *de novo*. *Cent. States SE & SW Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 247 (2d Cir. 2007).

We consider the three areas of dispute: (a) the Bonus Payment, (b) the Contingent Payments, and (c) attorneys' fees.

**A.** *Bonus Payment*

The district court dismissed the claims of nearly 400 non-responsive plaintiffs for failure to prosecute. These plaintiffs did not sign the stipulation of dismissal that was attached to the Agreement as Exhibit S. Nonetheless, the district court determined that they should be removed from the EPL. This decreased the denominator for the calculation of opt-ins and increased the opt-in percentage to above 99%, thereby triggering the Bonus Payment. Defendants argue that under the plain terms of the Agreement, these plaintiffs should not have been excluded from the EPL. They contend that only eligible plaintiffs who *voluntarily* dismissed their actions with prejudice should have been excluded,

-13-

while the claims of these plaintiffs were *involuntarily* dismissed. Defendants

argue, then, that the district court rewrote the agreement, substituting its own

judgment for that of the parties.

  **i.**  *Applicable Law*

    A fundamental precept of contract law is that agreements are to be

construed in accordance with the parties' intent. *Greenfield v. Philles Records, Inc.*,

98 N.Y.2d 562, 569 (2002).[5] The best evidence of what the parties intended "is

what they say in their writing." *Id.* (quoting *Slamow v. Del Col*, 79 N.Y.2d 1016,

1018 (1992)); *see also Cont'l Ins. Co. v. Atl. Cas. Ins. Co.*, 603 F.3d 169, 180 (2d Cir.

2010) ("When interpreting a contract, the 'intention of the parties should control,

and the best evidence of intent is the contract itself.'") (citation omitted).

Accordingly, "a written agreement that is complete, clear and unambiguous on

its face must be enforced according to the plain meaning of its terms." *Greenfield*,

98 N.Y.2d at 569 (citing *R/S Assoc. v. N.Y. Job Dev. Auth.*, 98 N.Y.2d 29, 32 (2002)).

The meaning of a contract, however, is not "necessarily to be fixed in absolute

accordance with the literal meaning of the language used," *In re Bond & Mortg.*

*Guar. Co.*, 267 N.Y. 419, 425 (1935), for the words of a contract must be given a

---

   [5]  New York law applies. *See* Air Transportation Safety and Stabilization
Act of 2001, § 408(b)(2), Pub. L. No. 107-42, 115 Stat. 230 (codified at note preceding 49
U.S.C. § 40101).

"'fair and reasonable meaning'" in accordance with the parties' intent. *Sutton v. E. River Sav. Bank*, 55 N.Y.2d 550, 555 (1982) (citation omitted).

If the terms of an agreement "suggest more than one meaning when viewed objectively by a reasonably intelligent person," then the agreement is ambiguous and extrinsic evidence may be considered to determine the parties' intent. *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010) (internal quotation marks omitted). The existence of an ambiguity is to "be ascertained from the face of an agreement without regard to extrinsic evidence." *Reiss v. Fin. Perf. Corp.*, 97 N.Y.2d 195, 199 (2001). Moreover, an omission or a mistake does not automatically render a contract ambiguous, *see id.*, but "an omission as to a material issue can create an ambiguity . . . where the context within the document's four corners suggests that the parties intended a result not expressly stated," *Hart v. Kinney Drugs, Inc.*, 888 N.Y.S.2d 297, 300 (3d Dep't 2009).

In limited circumstances, a court may supply a missing term in a contract. *See Haines v. City of New York*, 41 N.Y.2d 769, 771-72 (1977); *In re Bond & Mortg. Guar. Co.*, 267 N.Y. at 425; *Jermyn v. Searing*, 225 N.Y. 525, 541 (1919). A court may do so if the contract is ambiguous and the term "may be fairly and reasonably fixed by the surrounding circumstances and the parties' intent."

*Haines*, 41 N.Y.2d at 771-72; *see also City of Yonkers v. Otis Elevator Co.*, 844 F.2d 42, 48 (2d Cir. 1988) (explaining that terms may be implied based on either (1) what "the parties intended," (2) what "the parties would have intended had they thought about it," or (3) which "terms . . . are fair" so long as "the parties [have not] expressed [an] intent to the contrary" (quoting Helen Hadjiyannakis, *The Parol Evidence Rule and Implied Terms:  The Sounds of Silence*, 54 Fordham L. Rev. 35, 38 n.22 (1985))).  Courts should be "extremely reluctant," however, to imply a term that "the parties have neglected to specifically include." *Vt. Teddy Bear Co. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 475 (2004) (quoting *Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 72 (1978)).  Indeed, "'courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing.'" *Id.* (quoting *Reiss*, 97 N.Y.2d at 199).  A court may not imply a term based solely on "its personal notions of fairness," *Welsbach Elec. Corp. v. MasTec N. Am., Ltd.*, 7 N.Y.3d 624, 629 (2006), for the "ascertainment of the intention of the parties is paramount," *Schmidt v. Magnetic Head Corp.*, 468 N.Y.S.2d 649, 654 (2d Dep't 1983).

### ii.    *Application*

The district court noted that the Agreement was missing a term, as the Agreement did not address whether plaintiffs whose claims were involuntarily dismissed should be included in the EPL. The district court observed that the Agreement "did not provide for involuntary dismissals of cases, or what effect they should have on the list of eligible plaintiffs." The district court then went on to hold that the phrase "Plaintiffs who dismiss . . . by filing the Stipulation of Dismissal" includes plaintiffs who did not file a stipulation of dismissal, but whose claims were dismissed involuntarily because of their non-responsiveness. The district court did not, however, address whether the Agreement was ambiguous, nor did it attempt to determine whether a missing term could be "fairly and reasonably fixed by the surrounding circumstances and the parties' intent." *Haines*, 41 N.Y.2d at 772.

We conclude that the Agreement is ambiguous as to whether plaintiffs whose claims were involuntarily dismissed are to be included in the EPL, and we vacate and remand to the district court for the purposes of considering what the parties intended in this respect.

First, the Agreement is silent as to the treatment of plaintiffs whose claims were involuntarily dismissed; it does not use the words "voluntary" or

-17-

"involuntary" (although the Exhibit S Stipulation does use the term "voluntarily").  Likewise, it does not address whether plaintiffs' counsel could file stipulations of dismissals based on implied authorization or apparent authority.  This is a significant omission, as the claims of nearly 400 plaintiffs were involuntarily dismissed.

Second, there is a lack of clarity and precision in the provisions governing the calculation of the Opt-In Threshold.  The Agreement excludes "Plaintiffs who dismiss all of their Debris Removal Claims," but defines "Debris Removal Claims" as "all claims . . . *pending* or received on or before April 12, 2010."  Hence, there is some indication that the Agreement's effectiveness and any Bonus Payment should be based on "pending" claims; the claims in question were no longer "pending" once they were dismissed.  In addition, section VI.A *permits* the exclusion of "Plaintiffs who dismiss" from the EPL, but *requires* their exclusion from the calculation of the Opt-In Threshold.  This seemingly conflicts with Section VI.D.i, which defines the Opt-In Threshold as "[a]t least ninety-five percent (95%) of all Primary Plaintiffs on the [EPL]."  Because some plaintiffs may be on the EPL but must be excluded from calculating the Opt-In Threshold, there is some ambiguity about who should be counted when determining "actual opt-in experience for purposes of Section VI.D.i."  That "actual opt-in experience"

-18-

may not be based solely on a stale list of plaintiffs also suggests that the parties intended the Bonus Payment to be based on "actual" or live claims.

Similarly, section VI.A references "Plaintiffs who do not opt into the Final Settlement," only to provide that counsel's designation of a plaintiff's alleged Qualifying Injury on the EPL shall be deemed an admission to an interrogatory. That the Agreement makes evidentiary arrangements for plaintiffs who do not opt in further suggests that the parties may have intended a result not expressly stated: that non-participating plaintiffs would still be able to proceed with their claims. Finally, Section VI.A permits certain plaintiffs identified in Exhibit I to be excluded from the calculation of the Opt-In Threshold, but does not require that they "dismiss . . . by filing" the Exhibit S Stipulation.[6] Plaintiffs need only "dismiss with prejudice all of the claims relating to Qualifying Injuries." If the parties intended an involuntary dismissal to be sufficient to exclude an Exhibit I Plaintiff, it may be that they intended such a result for all plaintiffs dismissed with prejudice, regardless of the manner of their dismissal.

---

[6] Further ambiguity is created because the Exhibit S Stipulation uses the term "voluntarily" even though such term is absent from Section VI.A.

Hence, we conclude that the Agreement is ambiguous as to whether plaintiffs whose claims were involuntarily dismissed are to be excluded from the EPL. In light of the surrounding circumstances, reasonable minds could disagree as to whether the phrase "Plaintiffs who dismiss" includes "Plaintiffs who are dismissed." We remand for the district court to consider extrinsic evidence of the parties' intent. *See City of Yonkers*, 844 F.3d at 46; *Scholastic Inc. v. Harris*, 259 F.3d 73, 82 (2d Cir. 2001) ("When the terms of a contract are ambiguous, reasonably subject to differing interpretations, a court may turn to evidence extrinsic to the agreement's four corners to ascertain the intent of the parties."). On remand, if the district court determines that the parties had an understanding as to the treatment of plaintiffs whose claims were involuntarily dismissed, it must give effect to that understanding. If the district court finds that the parties never considered the treatment of involuntary dismissals, then it may, if consistent with contract principles, imply a term -- but only if one "may be fairly and reasonably fixed by the surrounding circumstances and the parties' intent." *Haines*, 41 N.Y.2d at 772.

B.     *Contingent Payments*

The Agreement provided that defendants would be obligated to pay a Contingent Payment if fewer than 220 "New Debris Removal Claims" were

"filed or submitted" to the City "as of" certain Contingent Payment Determination Dates, the first being January 5, 2012. Between April 13, 2010 (the effective date of the Agreement) and January 5, 2012, some 260 such claims were filed. Most of the claims were dismissed, however, leaving only 84 claims pending as of January 5, 2012. The district court held that "the critical date for counting newly filed or submitted claims was January 5, 2012," and concluded that the withdrawn claims were not to be counted. The district court therefore counted only the 84 claims pending as of January 5, 2012, and held that the First Contingent Payment was triggered.

We conclude that the district court erred, for there is no ambiguity in the Agreement with respect to Contingent Payments. The Contingent Payments provision plainly provides that the key was the number of new claims "filed or submitted" as of January 5, 2012. The Agreement expressly defines "New Debris Removal Claims" as those that have been "filed," "asserted," or "served." Neither the Contingent Payments provision nor the definition of "New Debris Removal Claims" uses the word "pending" or any words equivalent thereto. *See Greenfield*, 98 N.Y.2d at 569 ("[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms.") (internal quotation marks and citation omitted).

-21-

In concluding that only pending claims were to be counted, the district court wrote:

> [A] claim that was withdrawn or dismissed on the merits prior to the critical date . . . is not a claim to be counted. It may be found in the file, but it is no longer a claim to be reckoned with. The dismissed claim perhaps may have historical interest, but it is no longer of practical interest to parties or litigants. The claim died with its dismissal, for a dismissed claim on the merits -- and all the dismissed claims were dismissed with prejudice -- cannot be brought again. Since it is no longer a live claim, the WTC Captive is wrong to count it as such.

Of course, there is some logic to the district court's reasoning, but the district court was not free to substitute its own reasoning or "personal notions of fairness" for the intent of the parties. *Welsbach Elec.*, 7 N.Y.3d at 629. If the parties had intended to count only claims "pending" as of the trigger dates, they would have so provided; instead, they referenced claims "filed or submitted" as of the trigger dates.[7]

In sum, we hold that the district court erred in ordering defendants to make the First Contingent Payment. We therefore reverse in this respect.

---

[7] Although not dispositive, it is worth nothing that plaintiffs' counsel apparently agreed initially with defendants that no Contingent Payment was due. Indeed, the parties initially operated under the assumption that the first Contingent Payment had not been triggered, and it was only after the district court *sua sponte* raised the issue that plaintiffs took the contrary position.

**C.** *Attorneys' Fees*

Finally, we turn to the district court's decision to bar plaintiffs' counsel from collecting fees with respect to the Bonus and Contingent Payments.

**i.** *Applicable Law*

Federal courts have supervisory power over attorneys' fee arrangements. *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 226, 240 (2d Cir. 1987); *see Alderman v. Pan Am World Airways*, 169 F.3d 99, 102 (2d Cir. 1999) ("Courts have broad authority to refuse to enforce contingent fee arrangements that award fees that exceed a reasonable amount."). This is so because the courts have inherent authority to "police the conduct of attorneys as officers of the court," and this authority includes "the right to inquire into fee arrangements." *In re Goldstein*, 430 F.3d 106, 110 (2d Cir. 2005) (internal quotation marks and citations omitted). Therefore, courts may review a fee arrangement for reasonableness even if it has not been challenged by the parties. *See Rosquist v. Soo Line R.R.*, 692 F.2d 1107, 1111 (7th Cir. 1982) ("Courts have a stake in attorney's fees contracts; the fairness of the terms reflects directly on the court and its bar.").[8]

---

[8] There is some difference among the parties as to whether the attorneys' fees question is governed by state or federal law. We need not decide the question,

The reasonableness of a fee award is a matter committed to the "sound discretion" of the district court, and we review a district court's award of attorneys' fees under a highly deferential abuse of discretion standard. *McDaniel v. Cnty. of Schenectady*, 595 F.3d 411, 414-16 (2d Cir. 2010); *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 47 (2d Cir. 2000); *Alderman*, 169 F.3d at 102. In mass tort cases, district courts have routinely capped attorneys' fees *sua sponte*. *See, e.g., In re Zyprexa Prods. Liab. Litig.*, 424 F. Supp. 2d 488, 490-91 (E.D.N.Y. 2006) (capping attorneys' fees at 20% for one class of plaintiffs, citing an earlier opinion where it noted that "the court has the explicit power to require reasonable fees in class actions"); *In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*, MDL No. 05-1708, 2008 WL 3896006, at *10 (D. Minn. Aug. 21, 2008) ("[T]he maximum amount of contingency fees that any firm will be allowed to collect is [limited to] approximately 28%." (footnote omitted)).

To determine the reasonableness of fees in the context of common funds, we have considered the following six factors:

> (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation . . . ; (4) the

---

however, because our analysis would not change. Under both federal and New York law, courts are permitted to review contingent fees for excessiveness. *Compare Lawrence v. Miller*, 11 N.Y.3d 588, 596 (2008), *with In re Agent Orange*, 818 F.2d at 240.

quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations.

*Goldberger*, 209 F.3d at 50 (citation omitted) (alteration in original); *see City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 470 (2d Cir. 1974). New York state courts have adopted a similar set of factors in determining the reasonableness of fee structures. *See In re Estate of Freeman*, 34 N.Y.2d 1, 9-11 (1974)

**ii.** *Application*

The district court ruled that plaintiffs' counsel could not recover a contingent fee from the Bonus Payment or the First Contingent Payment.

**a.** ***The Bonus Payment***

While we remand for further proceedings with respect to the Bonus Payment, only the amount of the Bonus Payment is in dispute. It is uncontested that defendants must make a Bonus Payment, and thus the attorneys' fee question -- whether plaintiffs' counsel will receive a percentage of the Bonus Payment, whatever the amount turns out to be -- is still before us.

We conclude that the district court did not abuse its discretion in holding that plaintiffs' counsel are not entitled to recover a contingent fee with respect to the Bonus Payment. As the district court observed, the settlement of these suits (against these as well as other defendants) has generated some $725

million in recoveries, and plaintiffs' counsel stand to recover some $187 million in attorneys' fees, after the reimbursement of expenses. The district court's determination this amount is "more than sufficient to compensate counsel for their representation" did not exceed the bounds of its discretion.

We note the following:

First, plaintiffs' counsel did not submit any evidence of the number of hours they worked. Indeed, the attorneys represented to the district court that they "didn't have any records" of the number of hours expended. The district court observed that "none of these firms apparently maintained time records." Without time records, the district court was unable to calculate the lodestar to do a "cross check" on the reasonableness of the fees. *See Goldberger*, 209 F.3d at 50; *see also Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983) (evidence of hours worked is "most useful starting point" in determining reasonable attorneys' fees).

The second factor, the "magnitude and complexity of the litigation," weighs in favor of a substantial fee for plaintiffs' counsel. This was perhaps "the most complex mass tort case in the history of the United States." Still, $180 million is indeed a substantial fee.

Third, there was little risk that plaintiffs would not obtain a substantial recovery in this litigation. In 2003, Congress appropriated $1 billion

for the WTC Captive to insure New York City for tort claims arising out of the attacks of September 11, 2001. Thus, the attorneys who took on this case did not face all the risks inherent in other mass tort litigations -- such as the risk that plaintiffs would be denied any recovery or that defendants would be judgment-proof.

As to the fourth factor -- quality of representation -- while the district court was, on the whole, complimentary of plaintiffs' counsel, it also chided them for certain delays and raised several ethical concerns about conflicts of interest in the fee arrangements.[9]

Fifth, the cap of 25% of plaintiffs' recovery on the base settlement amounts was supported by precedent within this Circuit and in mass tort cases nationwide. The district court did not contravene precedent in precluding additional recovery with respect to the Bonus Payment. *See, e.g., In re Zyprexa,* 424 F. Supp. 2d at 490-91 (capping attorneys' fees at 20% for one class of

---

[9] The district court observed that permitting plaintiffs' counsel's fee to increase based on the Bonus Payment raised problematic conflicts of interest. Where an attorney derives a benefit when his clients agree to settle or dismiss their claims, a conflict of interest may arise. It is a reasonable exercise of a court's power to modify a fee arrangement to prevent a violation of the attorney's ethical responsibilities. *See Rosquist,* 692 F.2d at 1111; *see also In re Vioxx Prods. Liab. Litig.,* 650 F. Supp. 2d 549, 561-62 (E.D. La. 2009); *In re Zyprexa,* 424 F. Supp. 2d at 490.

plaintiffs); *In re Guidant*, 2008 WL 3896006, at *10 (limiting contingency fees to 28%).

Finally, the district court did not abuse its discretion in being mindful of public policy concerns. The district court was keenly aware that the funds available to these victims are limited. It recognized that overcompensation of attorneys would take away money from needy plaintiffs, and it was rightfully sensitive to the public perception of overall fairness.

In short, we hold that the district court acted reasonably in limiting plaintiffs' attorneys' fees to 25% of the base settlement amounts, approximately $187 million, and it did not abuse its discretion in precluding plaintiffs' attorneys from recovering a contingency fee from the Bonus Payment.

### b. *The First Contingent Payment*

Plaintiffs' counsel also appeal from the district court's denial of any attorneys' fee with respect to the First Contingent Payment. As we have reversed the district court's order compelling defendants to make the First Contingent Payment, the appeal from this aspect of the district court's rulings is moot.

### *CONCLUSION*

For the reasons set forth above, we:

1.     **VACATE** the order of the district court with respect to the Bonus Payment and **REMAND** for further proceedings in this respect;

2.     **REVERSE** the order of the district court as to the Contingent Payment;

3.     **AFFIRM** the order of the district court denying a contingency attorneys' fee as to the Bonus Payment; and

4.     **DISMISS** the appeal from the order denying a contingency attorneys' fee as to the First Contingent Payment.